EL PUEBLO DE PUERTO RICO, demandante y apelado,
*v.* JUAN CRUZ ROMÁN, acusado y apelante.

*Número:* 17001    *Resuelto:* 31 de enero de 1962

*Juan Cruz Román* por sí, y *Francisco García Quiñones*, abogado del apelante; *Arturo Estrella, Procurador General Interino* y *Jorge Segarra Olivero, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Santana Becerra y Rigau.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El apelante fue acusado ante el Tribunal Superior, Sala de San Juan, de un delito de Asesinato en Primer Grado, consistente en que el día 3 de abril de 1958 y en Carolina, Puerto Rico, "en forma ilegal, voluntaria, criminalmente, con malicia premeditada, deliberación, con intención, propósito decidido y firme de matar, demostrando tener un corazón pervertido y maligno, acometió y agredió al ser humano Lydia María Cruz Fernández con un puñal, infiriéndole varias heridas de carácter grave, que le ocasionaron la muerte."

En el acto de la lectura de la acusación el acusado hizo alegación de inocencia y solicitó ser juzgado por un jurado. La vista del juicio oral se celebró durante los días 11, 12 y 13 de agosto de 1958, estando el acusado representado por el abogado Francisco García Quiñones.

Durante el juicio, y mientras se ventilaba un incidente sobre la voluntariedad de una declaración jurada prestada

por el acusado ante el Fiscal, surgió una duda sustancial sobre la cordura del reo y el Tribunal ordenó que la cuestión se sometiera a la decisión de tres peritos médicos, los cuales designó. El Tribunal de Peritos Siquiatras así nombrado, luego de haber examinado al acusado, rindió un informe haciendo constar que dicho acusado no estaba mentalmente capacitado para entrar a juicio y responder del delito que se le imputaba.[1] En vista de este informe, que fue aceptado por el fiscal y la defensa, el Tribunal dictó una orden declarando sin efecto ni valor los procedimientos del juicio oral, ordenó que el acusado fuera trasladado al Hospital de Siquiatría y suspendió todos los procedimientos hasta que el acusado tuviera plena capacidad para enfrentarse a la acusación.[2]

Nunca se dio cumplimiento a aquella parte de la orden que disponía el ingreso del acusado en el Hospital de Siquia-

[1] El informe, suscrito por los doctores Carlos L. Massanet y Ramón H. Señeriz, lee, en lo esencial, como sigue:

"Certificamos que después de examinado el acusado Juan Cruz Román, llegamos a la conclusión de que en la tarde de hoy no está mentalmente capacitado, en contemplación de la ley, para entrar a juicio y responder del delito que se le imputa. Recomendamos su hospitalización en el Hospital Insular de Siquiatría para ser sometido a examen de laboratorio, pruebas sicológicas y aquellos otros exámenes que la Facultad de dicha institución crea pertinentes, en su caso."

[2] La orden del Tribunal, en su parte dispositiva, lee así:

"Primero: Que los procedimientos en este caso no tienen valor ni efecto alguno en relación con el acusado, quien no podía, a la luz del examen médico, responder mentalmente de la imputación que se le hacía en juicio y no estaba en condiciones de asesorar a su abogado ni cooperar con su abogado en la defensa de sus derechos; segundo: que se traslade inmediatamente a este acusado del sitio donde actualmente se encuentra recluido al Hospital de Siquiatría del Estado Libre Asociado de Puerto Rico, para que en dicha institución sea recibido y se proceda a dar cumplimiento a las recomendaciones de los peritos siquiatras; tercero: que copia del informe rendido por los peritos siquiatras se acompañe a esta orden para conocimiento específico y detallado de lo que recomiendan los peritos del Hospital.

"Quedan suspendidos todos los procedimientos en este caso hasta que se rinda un informe final por las autoridades médicas que entienden en el examen y tratamiento de este acusado o hasta que él esté en condiciones mentales de enfrentarse a un juicio de esta naturaleza y en plena capacidad de enfrentarse a la acusación que se le imputa."

tría. En 8 de diciembre de 1959, los doctores Massanet y Señeriz volvieron a examinar al acusado por orden del Juez y en esta ocasión rindieron un informe haciendo constar que el reo estaba mentalmente capacitado para entrar a juicio y responder del delito que se le imputaba.[3]

En vista de dicho informe el caso fue señalado nuevamente para juicio y el mismo se celebró durante los días 13, 14 y 15 de enero de 1960, estando el acusado representado por su abogado de récord, Sr. García Quiñones. El jurado que entendió en la causa declaró culpable al acusado del delito de asesinato en segundo grado y el Tribunal le sentenció a cumplir una pena de 15 a 30 años de presidio.

En apoyo de este recurso el acusado—apelante ha radicado un alegato por su propio derecho, y otro suscrito por su abogado. En el alegato suscrito por el acusado se señalan tres errores, a saber: (1) improcedencia de una sentencia por el delito de asesinato en segundo grado ya que no se probó la malicia premeditada, la deliberación y propósito de causar la muerte a la interfecta; (2) se violaron los derechos del acusado a gozar de un juicio rápido y público, y (3) la conducta anterior del acusado no justifica una sentencia de 15 a 30 años de presidio. ▮

El primer error no fue cometido. La prueba del Ministerio Público, única que tuvo ante sí el jurado, justifica ampliamente el veredicto rendido declarando al acusado convicto de Asesinato en Segundo Grado. Dicha prueba demostró que la interfecta Lydia María Cruz Fernández era hija del acu-

---

[3] Dicho informe lee:

"Nosotros, médicos cirujanos, especialistas en siquiatría y debidamente autorizados por el Tribunal Examinador Médico de Puerto Rico para ejercer la profesión de médico-cirujano en la Isla y ahora ejerciendo en la Zona Metropolitana, constituidos en Tribunal de Peritos en Siquiatría por orden del Hon. Joaquín Correa Suárez, Juez de este Tribunal, certificamos que después de examinar al acusado Juan Cruz Román llegamos a la conclusión que en la mañana de hoy está mentalmente capacitado en contemplación de la ley para entrar a juicio y responder del delito que se le imputa."

sado y de su esposa Felícita Fernández y vivía con éstos. A fines del mes de marzo de 1958, Lydia María se fue a vivir maritalmente con un señor llamado Emiliano Ramírez Fernández. En la tarde del día 3 de abril del mismo año el acusado se encontró con un amigo a quien se quejó de la acción que le había hecho su hija, se afligió y lloró. Instantes después, Lydia María, acompañada de la señora Catalina Ramírez pasa cerca del acusado. Este le pregunta que por qué no le pedía la bendición. Ella así lo hizo y él le echó la bendición. Entonces el acusado le dijo a su hija que fuera a buscar la ropa de ella que había dejado en casa del acusado. Horas después esa misma tarde 3 de abril, Lydia María, acompañada de doña Catalina Ramírez y de José Ramón Fernández, fue a la casa de sus padres a buscar su ropa. La madre de Lydia María echó la ropa en un baúl y en el momento en que lo entregaba a José Ramón Fernández, el acusado apareció súbitamente con un puñal y la emprendió a puñaladas contra su hija Lydia María, causándole la muerte. Realizados estos hechos, el acusado subió a su casa y luego de cerrar las puertas se infirió varias heridas. █

La malicia y la premeditación son elementos esenciales del delito de asesinato en segundo grado. El Estado no viene obligado a ofrecer prueba directa y específica de un estado mental y subjetivo como lo es la malicia premeditada pudiendo ésta inferirse de la manera como se usa un arma. *Pueblo* v. *Blanco*, 77 D.P.R. 667; *Pueblo* v. *Torres*, 75 D.P.R. 231; *Pueblo* v. *Méndez*, 74 D.P.R. 913. Los hechos relatados daban base al Jurado para inferir la existencia de malicia premeditada ya que no se desprende que al dar muerte a su hija el acusado actuara movido por un arrebato de cólera o en una súbita pendencia. Tampoco hubo provocación por parte de la víctima ni surgen circunstancias que mitiguen, excusen, justifiquen o atenuen el hecho de la muerte. Los hechos probados indican, que el acusado demostró tener un corazón pervertido y maligno. █

El segundo error es frívolo. Está predicado en el hecho de que la prisión preventiva del acusado excedió de seis meses. Si bien la detención preventiva antes del juicio que exceda de seis meses es en sí ilegal, no es motivo para que el proceso que contra el detenido se siga, no pueda continuar contra él transcurrido dicho período, ni para que quede por ello exonerado del delito. *Pueblo* v. *Ortiz*, 76 D.P.R. 247. Véase además, *Sánchez* v. *González*, 78 D.P.R. 849. ■

El tercer señalamiento es igualmente frívolo. La pena impuesta al apelante se ajusta a derecho. La ley autoriza al juez sentenciador a imponer un mínimo mayor que el mínimo fijado en el estatuto penal y un máximo que no exceda del máximo estatutario. Ley Núm. 295 de 1946 según ha sido enmendada por la Ley Núm. 176 de 1949; *Vázquez* v. *Rivera*, 70 D.P.R. 218; *Pueblo v. Tribunal Superior*, 78 D.P.R. 153.

El apelante, por conducto de su abogado, señala la comisión de los siguientes errores:

"Primer Error: El Tribunal cometió error fundamental al no dar curso al dictamen de los siquiatras, en el primer juicio.

"Segundo Error: El Tribunal cometió error al no suspender el segundo juicio para dar curso al dictamen de los siquiatras.

"Tercer Error: El Tribunal cometió error al juzgar al acusado y someterlo a juicio en abierta violación al debido procedimiento de ley que su caso requería."

Discute estos tres errores conjuntamente. Su tesis es al efecto de que no podía someterse a juicio al acusado hasta tanto fuera recluido en el Hospital de Siquiatría según lo había ordenado el Juez Correa Suárez; que a estos fines debió suspenderse la vista del caso y que al negarse a ello, el Tribunal violó el derecho del acusado a un debido procedimiento de ley. ■

No tiene razón. Nuestro Código de Enjuiciamiento Criminal contiene disposiciones que prohiben que una persona sea juzgada, sentenciada a una pena o penada por un delito público mientras esté loca. Artículos 439 al 444 del Código

de Enjuiciamiento Criminal de Puerto Rico, 34 L.P.R.A., secs. 1571-1576.([4]) Por otro lado, la locura, al momento de la comisión del delito es un eximente de responsabilidad criminal. Artículo 39 del Código Penal, 33 L.P.R.A., sec. 85.([5]) Pero la locura, como incapacidad para someterse a juicio y a sentencia, no tiene conexión legal alguna con la responsabilidad o irresponsabilidad del acusado al tiempo de cometer el delito. El propósito de los artículos 439 y siguientes del Código de Enjuiciamiento Criminal es impedir que se someta a juicio a un reo que es incapaz de comprender la naturaleza y propósito de los procedimientos que contra él

---

([4]) El artículo 439 dispone: "Ninguna persona puede ser juzgada, sentenciada a una pena o penada por un delito público, mientras esté loca." El 440 provee: "Si cuando se haya citado a juicio para decidir una causa, o en cualquier momento durante el juicio, o cuando se haga comparecer al acusado para oir la sentencia basada en la convicción de su culpabilidad, surge alguna duda sustancial respecto a la cordura del reo, el tribunal debe ordenar que esta cuestión se someta a la decisión de tres peritos que designará y el juicio o el acto de pronunciar la sentencia debe suspenderse hasta que la cuestión quede resuelta por la decisión de dichos peritos. El jurado citado para el juicio puede ser exonerado de su obligación o quedar constituido, mientras esté pendiente de decisión el punto relativo a la locura, según lo que disponga discrecionalmente el tribunal." El 441 prescribe el procedimiento a seguirse para resolver la cuestión de locura. El 442 dispone: "Si los peritos declaran cuerdo al acusado, debe continuar el juicio o ser pronunciada la sentencia, según el caso. Si declaran loco al acusado, debe suspenderse el juicio o la sentencia hasta que recobre la razón y el tribunal debe disponer, que, en el ínterin, sea recluido el acusado en un manicomio, y que cuando vuelva al uso de la razón, sea entregado al alcaide de la cárcel." El 443 contiene disposiciones relativas a la fianza que hubiere prestado el acusado, y el 444 establece: "Si el acusado es recibido en el manicomio, debe impedírsele salir de él hasta que recobre la razón. Cuando esto suceda, el superintendente del asilo debe dar aviso del hecho al fiscal. Como consecuencia de dicho aviso, el alcaide de la cárcel debe sin demora sacar del manicomio al acusado y ponerlo bajo conveniente custodia, hasta que sea conducido ante el tribunal para la celebración del juicio o para oir la sentencia, según el caso, o hasta que sea absuelto legalmente."

([5]) En Puerto Rico el acusado puede levantar la defensa de locura al negar la acusación. Si el jurado pronuncia un veredicto absolutorio fundado en la demencia del acusado, el Tribunal puede instituir procedimientos para averiguar si el acusado continúa demente con el propósito de ordenar su reclusión en un asilo. Art. 293 del Código de Enj. Criminal, 34 L.P.R.A. sec. 823.

se siguen, y como consecuencia, de defenderse adecuadamente. A personas en esta situación se les considera locas a los fines de las disposiciones del Código de Enjuiciamiento Criminal antes mencionadas. *People* v. *Field,* 238 P.2d 1052; *People* v. *Merkouris,* 297 P.2d 999; *People* v. *Jensen,* 275 P.2d 25; *People* v. *Renteria,* 6 Cal. Rptr. 640; *People* v. *Dailey,* 345 P.2d 558; Werhofen, *Mental Disorder As a Criminal Defense,* pág. 430.

Interpretando el citado artículo 440 del Código de Enjuiciamiento Criminal, resolvimos en *Pueblo* v. *Báez,* 67 D.P.R. 301, que el someter a peritos la cuestión de locura del acusado en el momento del juicio es necesario sólo cuando surge en la mente del juez sentenciador duda sustancial en cuanto a esa locura; que una moción a esos efectos va dirigida a la discreción de la corte inferior y que solamente cuando dicha corte abusa de su discreción es que estamos justificando en intervenir con su resolución. Se ha resuelto que la duda a que se refiere el susodicho artículo 440 debe surgir en la mente del juez y no en la mente del abogado del acusado o de alguna otra persona. *People* v. *Jensen,* supra; *People* v. *Gómez,* 258 P.2d 825; *People* v. *Harmon,* 243 P.2d 15; *State* v. *Kitchens,* 286 P.2d 1079; *People* v. *Dailey,* supra. Convenimos con el Procurador General en el siguiente razonamiento, expuesto en su Informe:

"Al momento de la celebración del segundo juicio, el magistrado que presidió el mismo tenía ante sí un informe suscrito por dos psiquiatras—los mismos que examinaron y declararon mentalmente incapacitado al acusado en el primer juicio—expedido el día 8 de diciembre de 1960 y en el cual dichos psiquiatras certifican que, el acusado Juan Cruz Román, estaba mentalmente capacitado para entrar a juicio y responder del delito que se le imputaba. Además, el propio representante legal del acusado admitió que su cliente ya no estaba loco. (Véase T.E., segundo juicio, a la pág. 88). Siendo así, no vemos en qué forma podía surgir una duda sustancial en la mente del magistrado sobre la cordura del reo. Es igualmente improbable que el juez de instancia abusara de su discreción al negarse a sus-

pender los procedimientos para darle curso al primer dictamen de los psiquiatras.

"A estos efectos es irrelevante el hecho de que el Tribunal que entendió en el primer juicio contra el acusado-apelante, no diera curso al dictamen de los psiquiatras. Estamos de acuerdo con la contención del apelante de que, a partir de ese momento, la reclusión del acusado en una institución penal resultó ser ilegal. No creemos, empero, que de ello puedan extraerse las consecuencias que pretende la defensa del apelante.

"Ya hemos visto que el propósito de las disposiciones del Código de Enjuiciamiento Criminal a que se ha venido haciendo referencia, es impedir que se someta a juicio a un reo que es incapaz de comprender la naturaleza y propósito de los procedimientos que contra él se siguen y que, por ende, no puede ayudar eficazmente a su defensa. En consecuencia, cualquier orden dictada al amparo de las referidas disposiciones, ordenando que el acusado sea recluido en un Hospital de Psiquiatría, sólo puede ir enderezada a conseguir que en dicha institución el acusado recobre la razón y pueda, en su día, ser conducido al Tribunal, ya restablecida su salud mental, para la celebración del juicio. Si al comparecer a la celebración del segundo juicio el acusado ha recobrado la razón, es decir, está cuerdo, resulta inmaterial el problema de si debió haber recobrado la razón en un Hospital de Psiquiatría, en vez de cualquier otro lugar." (Informe del Procurador General, págs. 11 y 12.)

*No habiéndose cometido ninguno de los errores señalados por el acusado-apelante, se confirmará la sentencia apelada.*